BREAUX, J.
The city of Shreveport sued the policy jury of the parish of Bossier to restrain its president and its treasurer from disposing of any of the funds, identified as the “Bridge Fund,” and to enjoin the police jury from authorizing the payment of any part of this fund.
The joint right of the two bodies, just mentioned, over the ferry across Red river, has been recognized from the earliest period in the history of the state.
The last statute absolutely recognizing this joint right was enacted in 1898 — No. 153, of the legislative session of that year. The delegation of authority regarding this right reads as follows:
“To establish and regulate and jointly with the parish of Bossier, let out the ferry or ferries across Red river within the limits of said city, the revenues from the same to be equally divided between the said city and parish of Bossier.”
Under a number of laws, the rights of Bossier in the crossing have been recognized. At first it was exclusively the right of the city of Shreveport, to which the Legislature had granted the right of establishing ferries across Red river within its limits. Originally the whole of the territory was within the limits of the settlement known as Natchitoches, which appears to have been indifferent to the right.
In the year 1828, Claiborne parish was created out of Natchitoches, and its western boundary extended to the bank of the Red river, where Shreveport is situated. This parish also seems to have been indifferent to the benefit to be derived from the ferry in question.
In the year 1843 the parish of Bossier was created out of Claiborne, and the eastern bank of the Red river, at Shreveport, became one of the boundary lines of Bossier. From that time the less prosperous parish sought to divide with her rising and prosperous neighbor, the city of Shreveport, one-half of the revenues from this ferry.
In 1847 this court held that an exclusive right had been granted to the city of Shreveport to establish ferries across the Red river within its limits, and that this right had not been repealed by the law creating the parish of Bossier in 1843. The court said that the power to establish ferries, granted to the police jury of Bossier, must be subordinated to that conferred upon the town of Shreveport, within the corporate limits of the latter. Douglass v. Craig, 2 La. Ann'. 919.
. Very soon after, the Legislature took the matter in hand, and enacted Act No. 230 of the session of 1848, which amended the original act incorporating the city of Shreveport, by granting to the parish of Bossier one-half of the net proceeds'that may arise from the ferry across Red river, now established, or any ferry which may hereafter be established, at or near the town of Shreveport
The city of Shreveport contested the right granted to the parish of Bossier under said statute, and urged that it had an exclusive right, under its charter, to establish ferries across Red river; that it was not a mere granting, but was given under certain conditions, which are clearly set forth in the decision cited infra.
*175 The court held that Shreveport did not own under its charter a contract or vested right which the Legislature could not change or annul, and that, in consequence, the act of March, 1848, granting to the parish of Bossier the right to demand and receive onethalf of the net proceeds of the revenues arising from the ferry, was not unconstitutional. Police Jury of Bossier v. Shreveport, 5 La. Ann. 661.
Afterward, to the time that an iron bridge was constructed, plaintiff and defendant owned and kept together a ferryboat across the stream.
In course of time the Vicksburg, Shreveport & Pacific Railway proposed to build a bridge (the iron bridge just mentioned). The proposal was accepted by the city of Shreveport and Bossier parish. An agreement was drawn up and signed py these three parties— Bossier parish, Shreveport, and the railway. The act is lengthy. It was copied in Oliff v. Shreveport, 52 La. Ann. 1204, 27 South. 688, and for that reason it will not be copied here again. It sets forth the condition on which the iron bridge was constructed.
This bridge has yielded a large revenue, as it affords means ,to all comers to cross from one side of the stream to the other.
The amount of tolls each year is not less than $20,000. One half is collected by Bossier parish, and the other by the town of Shreveport. It is now proposed to apply the whole of this amount and control the annual revenues hereafter, to an amount sufficient to build a bridge across the stream to be used by all free of charge, and to put an end to a pay bridge altogether. To this the parish of Bossier strenuously objects, and the objections are: That plaintiff’s petition discloses no cause of action; that if Act No. 158, p. 295, of 1898, and the amendatory act, No. 201, p. 387, of 1902, were intended to affect Bossier parish, they are both violative of article 31 of the Constitution; that the legislation is special and local; and other grounds to which we will not particularly refer, and which we will consider as incidental to those upon which our decision is based.
The act of 1902, as expressed in its title, has for an object to amend and re-enact section 11 of No. 158 of 1S98, define the boundaries of Shreveport, and provide a better police and municipal government In each, the amended and amending act, it is stated that the clauses of the old charter of 1878 are retained, in order not to prejudice any of the rights of the parties to the suit, pending at the time, entitled Oliff v. Shreveport, but since decided adversely to plaintiff’s demand.
In each of these acts provisions are contained to authorize the city of Shreveport to hold an election by the citizens of the city of Shreveport to determine whether toll shall be charged on the bridge across the stream.
In accordance with the terms of these acts, commissioners were appointed, and an election was held, which resulted in favor of a bridge, without charge for crossing. The result was promulgated. Plaintiff sets forth in its petition, in substance, that, in view of the election just mentioned, the parish of Bossier is collecting half of the revenue to which it has no right, and against its collecting and expending any of this fund the injunction is directed as a preventive.
The able and learned judge prepared an elaborate opinion, and decided against the defendant.
In the opinion he, in substance, stated that the Legislature failed to express itself clearly in regard to the interest of the parish of Bossier, but he thought that the acts as a whole, viewed in the light of the conditions which existed when they were adopted, clearly indicate that such was the intention of the law.
Prom the judgment rendered, defendant prosecutes this appeal.
We take up, in the first place, for discussion, the exception of no cause of action, as *177 this involves the alternative proposition whether the two acts (the one of 1898, and the other of 1902, on the subject here) have the effect of taking from Bossier parish whatever may be her interest to one-half of the revenues before mentioned.
We should state now that Bossier parish met one-half of the expenses to maintain the crossing prior to the bridge, and also met some of the expenses necessary at the time the iron bridge was constructed.
Returning to our alternative proposition. It looks very much as if the Legislature, in its desire to afford to Shreveport the legitimate advantage of a much-needed bridge, open to all, free of charge, has overlooked one of the joint parties, which has been, and still is, very much concerned in a pay bridge or ferry.
The terms of these acts refer to the Shreveport end of the bridge, and fail to expressly include the Bossier end as being within their grasp. It binds the Shreveport end hard and fast, and leaves the other somewhat free, we must say.
In the first place, the statement provides the right of the city of Shreveport to “fix and regulate tolls on the present bridge over Red river, in conjunction with Bossier parish,” “shall be submitted to an election by the qualified electors within the new territorial limits of said city.”
Construing these sentences as we may, we do not think that it disposes of the Bossier end of the bridge by bringing it exclusively within the jurisdiction of the city of Shreveport. In the paragraph of the acts following, special reference is made to the interest of the city of Shreveport, and, while there are broadened, comprehensive expressions looking to a fareless bridge, not once is any special mention made of the parish of Bossier. It is scarcely sufficient, after these many years of joint action and joint interest of the two bodies, to put an end to the relation without mentioning one of the parties, viz., the parish of Bossier.
The right of the latter parish is recognized to the extent of authorizing it “to sell and discontinue their interest in the present Vicksburg, Shreveport & Pacific Railroad bridge for adequate consideration.”
It is true that, perhaps, latitudinarian construction might supply “parish of Bossier” in the act after the city of Shreveport, but it is not advisable, in a matter of importance to both these bodies, for the court to supply these words whenever needed to show that Bossier also is included within the terms of the act, and that Bossier must surrender every right it may have. We think that, in a matter of this importance, npthing should be left to doubt and little to construction.
We certainly agree with our learned Brother of the district court that “the act referred to did not in so many words declare that the result of the election shall effect the entire bridge, the Bossier parish as well as the Shreveport end,” as expressed in his written opinion.
The “parish of Bossier,” after these many years, is entitled to know, by a special declaration of the Legislature, of the change in matter of its franchise or privilege.
Passing from this subject, we are brought to a consideration of defendant’s attack on the statute, on the ground that the object of the law is not stated in the title. Const, art. 31.
The title is deficient in this respect. Insufficient reference is made to Bossier in the body of the act, and no reference is made to this parish in the title. One is as wanting as to form as the other.
The contention of plaintiff is, as urged by the learned counsel, that a reference to the object of the statute in the title would have resulted in annulling the whole statute, for then it would have been expressed in the title that the statute had two separate and dis *179 tinct objects. Whether expressed in the title or not, as each law must have but one object, it follows that withholding all reference to the parish of Bossier did not have the effect of curing the objection, if, as urged, the law had two objects. We do not think that the law had two objects. As an amendment of the charter it had only one object. At the same time, we are decidedly of the view that the title should have been sufficiently broad to embrace both the parish of Bossier, whose right it was proposed to wipe out, as well as the amendment in full.
At least one half of the crossing over the stream was in Shreveport. It, as well as the other half, entered into the plan for municipal improvement. The object was not separate and distinct from those it exercised under its charter and prior to'amendment.
There are things which are in themselves separate and independent, which cannot be united and formed into one. But there are principles, purposes, not precisely the same, which may be brought to a condition of sameness, oneness, such as meant by the article of the Constitution.
We therefore conclude that the object should have been stated in the title, and that then, so far as relates to title, it would not have been subject to the objection now urged.
We conclude, further, that, in bringing the objects together to form a situation of “oneness,” those directly affected should be notified both by the title and the text of the statute.
In the legal conflict between these two litigants we do not think that ground is definitely sustained to justify us in granting damages. We decline to grant defendant’s prayer for damages.
It is therefore ordered, adjudged, and decreed that the writ of injunction is dissolved, and that plaintiff be nonsuited, at plaintiff’s costs, in both courts.
LAND, J., takes no part.